**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Robert Jeffrey FINK, Appellant.**

Superior Court of Pennsylvania.

Submitted Sept. 28, 2009.

Filed Feb. 16, 2010.

MaryJean Glick, Public Defender, Lancaster, for appellant.

Karen L. Mansfield, Asst. Dist. Atty., Lancaster, for the Com., appellee.

BEFORE: BENDER, GANTMAN and POPOVICH, JJ.

OPINION BY BENDER, J.:

¶ 1 Appellant, Robert Jeffrey Fink, appeals from the judgment of sentence of four to eight years' incarceration imposed after Fink violated conditions of his parole. Fink raises one issue for our review: "Did the court err in finding that Mr. Fink violated his [parole] by being discharged from sex offender counseling for failing to completely disclose his sexual history, where disclosure of this history required Mr. Fink to confess to committing criminal acts, and to provide information regarding these acts which could have provided an essential link in a chain of evidence resulting in criminal charges against him?" Brief for Appellant at 4. We concur in Fink's assessment that questions posed in a questionnaire he was required to complete in sex offender counseling would reveal "essential link[s] in a chain of evidence" that could support criminal prosecution on other charges. We conclude accordingly that Fink's responses were conditionally privileged, subject to his constitutional right against self-incrimination and our holding in *Commonwealth v. Shrawder*, 940 A.2d 436 (Pa.Super.2007). Thus, the trial court erred in declaring Fink in violation of his parole for refusing to complete the questionnaire. Accordingly, we vacate the judgment of sentence imposed upon Fink's parole violation and remand this matter for reinstatement of parole and probation.

¶ 2 On April 17, 2003, Fink pled guilty to charges of indecent assault and corruption of minors which arose from Fink's sexual touching of his six-year-old stepdaughter between October 2000 and June 2001. Fink was sentenced to five to twenty-three

months' incarceration, to be followed by three years' probation for indecent assault and five years' probation for corruption of minors to be served concurrently. On August 5, 2003, Fink was released on parole. On October 28, 2003, Fink was charged with violating his parole by having unsupervised contact with his eight-month-old daughter. On January 28, 2004, his parole was revoked and he was recommitted to serve the balance of his maximum sentence of incarceration, followed by three years' probation for indecent assault. In addition, the court imposed a sentence of five years' probation for corruption of minors to run concurrently with his sentence for indecent assault.

¶ 3 Fink was eligible for parole within one year of his recommitment. As a condition of parole, Fink was required to complete a sexual offender treatment contract to enter a specialized services program at T.W. Ponessa & Associates Counseling Services, Inc. The sex offender treatment contract required Fink to participate candidly in sex offender counseling. Thereafter, on October 4, 2006, the Commonwealth issued a writ alleging that Fink had violated his probation by being discharged from mandatory sex offender counseling and for having unreported and unsupervised contact with his newborn child. The trial court convened a hearing and, on November 30, 2006, Fink was found to be in violation of the conditions of his parole/probation. The court deferred sentencing to await a pre-sentence investigation and, on January 29, 2007, sentenced Fink to eleven and one-half to twenty-three months' incarceration followed by one year consecutive probation for indecent assault and a new, consecutive five year probation sentence for corruption of minors.

¶ 4 Fink was again granted parole on September 19, 2007. As a condition of parole, Fink was to re-enroll at T.W. Ponessa & Associates pursuant to the terms of his previous sex offender treatment contract. Fink did so, but participated in the counseling program only until October 23, 2007, when he refused to complete a polygraph disclosure questionnaire that made specific inquiries about Fink's past sexual conduct without regard to whether that conduct had resulted in criminal charges. After allowing Fink an extension in which to complete the questionnaire, T.W. Ponessa issued Fink a written warning, apprising him that unless he completed the form by March 3, 2008, he would be discharged from the program as unsuccessful. Fink continued his refusal to complete the questionnaire and, on April 15, 2008, the Commonwealth issued a new writ alleging that Fink had violated his parole by again being discharged from sexual offender counseling. The trial court held a probation violation hearing on September 23, 2008. At that hearing, John Welsh, a psychotherapist and certified sexual offender treatment specialist with T.W. Ponessa testified that he had been involved with Fink's treatment since he was originally sentenced on April 17, 2003. N.T. Probation Violation Hearing, 9/23/08, at 4–5. Mr. Welsh testified that, as a part of Fink's treatment, he was required to complete a Sexual Offender Treatment Contract, which "outlines the necessary criteria for compliance with treatment in terms of what is expected" of each client. *Id.* at 6; Commonwealth's Exhibit 1. The contract states, in relevant part, the following:

3. I will actively and honestly participate in the therapy process, self disclose and complete all homework assignments.

* * *

10. I also agree to the following conditions:

I understand that my probation/parole officer and/or DCYS social worker will be notified immediately of any violation of this contract. I also understand that local and/or State police departments may be contacted if necessary to maintain victim or community safety. I also understand and agree that any violation of the conditions of this contract may be grounds for termination from the program at the discretion of the staff. I agree the staff may terminate my treatment for any other behavior not outlined above.

\* \* \*

13. I understand that failure to comply with the aforementioned conditions and/or expectations will result in dismissal from treatment.

*See* Commonwealth's Exhibit 1. Fink initialed each of these paragraphs and also signed at the bottom of the contract. In addition, Fink signed a release form attached to the contract *stating that he consented and authorized T.W. Ponessa to disclose,* inter alia, *his polygraph results, outpatient treatment summary, psychological evaluation, and psychiatric evaluation.*

¶ 5 Mr. Welsh also testified that Fink was required to complete a "Salter Treatment Disclosure Questionnaire" (Polygraph Disclosure Questionnaire). N.T. Probation Violation Hearing, 9/23/08, at 7. Mr. Welsh characterized the form as "essentially a series of questions, different categories of sexual behavior, that someone has participated in in the past." *Id.* He also asserted that "[w]e are very clear in our program that we do not expect anybody to identify any specific information that could be used to incriminate them in a future criminal proceeding." *Id.* Mr. Welsh also reported that Fink had failed to turn in his Polygraph Disclosure Questionnaire, and when pressed to do so, turned it in only partially completed. *Id.* at 7–8. In fact, Fink had completed nine of the approximately 21 pages of the questionnaire. *Id.* at 22.

¶ 6 The questionnaire characterizes its disclosure requirements to focus only upon past conduct that has not been the subject of a criminal prosecution:

All questions relate only to behavior that occurred *before* the date of your last conviction for a sexual offense. All questions *exclude* this last offense or any offenses that occurred *since* your last conviction.

In short, this questionnaire is about your *history* prior to conviction.

You will be asked to take a polygraph examination to verify the <u>complete truthfulness</u> of your answers on this form. You should be very careful <u>not to with-hold or falsify</u> anything about your sexual history. You will not be considered to have successfully completed your sexual history until you have passed the polygraph.

You will be asked questions about victims of sexual offenses you have committed. You will not be asked to give <u>identifying</u> information about these victims. Should you report identifying information about these victims anyway, this information will be reported to Child Protective Services as required by State law.

*See* Commonwealth's Exhibit 2, at 2 (emphasis in original).

¶ 7 Section A of the questionnaire, which commenced its examination with the topic "Sexual Contact With Children," re-emphasized that "[a]ll questions relate to behavior that occurred *prior to* the date of conviction for your last offense and do not include that offense or subsequent offenses." *Id.* at 3. The form then asked "[h]ow many children did you have some

form of sexual contact with **prior to the date of conviction for your last offense?**" *Id.* (emphasis in original). It was followed by a blank line for Fink to enter a number, which Fink did. *Id.* The Questionnaire then provided a chart prompting Fink for information about each child victim, including the following:

(1) Victim's Age at First Sexual Contact
(2) Victim's Gender
(3) Your Age at First Sexual Contact
(4) Mo./Yr. of First Sexual Contact
(5) Mo./Yr. of Last Sexual Contact
(6) Frequency per Week
(7) Relationship to Victim
(8) Type of Sex Acts
(9) Type of Force Used

*Id.* Under the "Relationship to Victim" column, Fink was directed to designate "'F' for family, 'A' for acquaintance, 'S' for stranger, or 'O' for children of live-in girlfriend or boyfriend." *Id.*

¶ 8 The questions remaining in the nine pages of the Questionnaire that Fink completed, asked questions including the following, among others:

(1) Prior to the date of your last conviction, how many children did you *groom* for sexual activities (e.g. entice, persuade or manipulate)? Describe what you said or did and include a description of any rewards or gifts you gave to victims.

(2) Prior to the date of your last conviction, how many children did you *threaten* in order to get them to agree to sexual activities? Describe what you said or did.

(3) Prior to the date of your last conviction, how many children did you *physically force* into sexual activity? Describe what you did.

(4) Prior to the date of your last conviction, how many children did you

force into sexual activity by using a weapon? Describe the weapon(s) and what you said or did.

*Id.* at 4. The questionnaire also asked Fink how many times he bought, sold, traded, or made child pornography, and how many times he was involved with "sex rings," *i.e.,* "groups of adults who traded or used children for sexual purposes." *Id.* at 5. Additionally, the questionnaire asked how many times Fink had sexual contact with children while other adults were present and how many times he watched other adults have sexual contact with children. *Id.* at 5–6. The questionnaire further directed that he record the ages and gender of the children involved in both scenarios and disclose how many times he had sexual contact with children in countries other than the United States.

¶ 9 Lastly, the questionnaire asked how many times prior to the date of his last conviction he had sexual contact with animals, how many times he stole clothing for sexual purposes from someone's home, what clothing he stole, and where he stole it from in the home, *i.e.,* a bedroom, and whether he burned the clothing. *Id.* at 8. On the last page that Fink completed, he was asked about obscene phone calls he made, what he said to the people he called, and how he selected the people he called. *Id.* at 9.

¶ 10 Also at Fink's violation hearing, the Commonwealth introduced two prior Polygraph Disclosure Questionnaires that Fink had fully completed during previous counseling with T.W. Ponessa. Those two questionnaires, which were approximately twenty-one pages long, revealed what questions Fink refused to answer when he turned in only nine pages of his third Polygraph Disclosure Questionnaire. N.T. Probation Violation Hearing, 9/23/08, at 34. In the remaining pages of the questionnaire which Fink did not complete, he was

asked at what age he "first engaged in 'Peeping Tom' activities (*i.e.*, looked in a window, a shower, an open door, a bedroom, bathroom, urinal, etc., trying to spy on someone)," what he did while he was peeping, and how many times he engaged in "Peeping Tom" activities. Commonwealth's Exhibit 5, 8/17/05, at 4. He was also asked about the age at which he first exposed himself to others and when the last time was that he did so. *Id.*

¶ 11 Moreover, the incomplete pages of the questionnaire directed Fink to fill out a chart describing forced sex he had had with adults. The questionnaire defined "forced sex" as "incidents in which a person said 'no' to having sex with you," "incidents where you placed any kind of weapon within sight of the person (including ropes and ligatures) even if you did not directly threaten to use them," and "all incidents where you blocked someone's exit or otherwise interfered with his or her ability to leave." *Id.* at 5. Further, the questionnaire asked Fink to disclose the sex and age of the victim of forced sex, Fink's age at the time of the encounter, the type of sex acts and the type of force used. He was also asked whether he had ever beaten a person up before, during, or after sex and was asked to describe the injuries he inflicted; whether he had ever tied someone up against his or her will and was directed to describe "in detail," what he did and "the ropes, chains, handcuffs, tape or other restraints" he used. Additionally, the questionnaire asked whether Fink had ever tortured anyone and directed him to describe the torture and further, "[w]hat is the worst thing you have ever done to another person in order to hurt them or inflict pain?" *Id.* at 9. In one final question, Fink was asked "[h]ave you ever killed someone during or after sex?" and directed to describe what he did. *Id.*

¶ 12 Describing the Polygraph Disclosure Questionnaire on direct examination, Welsh sought to downplay the extent to which the foregoing inquiries could be perceived as incriminating, asserting that the agencies' clients were not asked to name the individuals they had assaulted and that no one who responded to the Questionnaire had ever been prosecuted:

[Mr. Welsh]: Well, if we look at the [Polygraph Disclosure Questionnaire], again, I know it asks to identify whether [the victim] may be a family member, stranger or acquaintance, and, again, things that [Fink's attorney] indicated previously.

But it does not, and I need to reinforce that, ask for specific identifying information.

We have hundreds and hundreds of clients undergo disclosure therapeutic polygraphs, pass such polygraphs and there are no legal ramifications, you know, either way.

It shows they are establishing a baseline of honesty in their treatment, which is critical.

* * *

[The Commonwealth]: If someone puts family in one of those blocks, that's as far as you're looking for on information?

[Mr. Welsh]: Exactly. We don't—we don't seek and we don't ask for any more specific information than that.

[The Commonwealth]: And the same would go for putting in acquaintance or stranger?

[Mr. Welsh]: That's correct.

*Id.* at 50–51. On re-cross examination, however, Fink's counsel queried Welsh about a provision of the treatment contract which required Fink's acknowledgment that "local and/or state police departments may be contacted, if necessary, to maintain victim or community safety." Welsh's ex-

planation reveals the limits of any confidentiality the agency might maintain vis-à-vis law enforcement:

[Fink's Attorney]: So, in other words, someone that initials [that portion of the treatment contract] would understand that if T.W. Ponessa felt it necessary to contact local and state police regarding information that they would disclose, that would be done, correct?

[Mr. Welsh]: That would be done.

Again, and the wording of that particular item is not—is not accidental, meaning that any violation of this contract, the probation or parole officer will be notified immediately, it says. Regarding local and/or state police departments, it says that they may be contacted, if necessary, to maintain victim or community safety.

Frankly, that would refer to someone who had offered specific identifying information; for example, that would be an unusual case in which we would have to consult as a team, and, more likely than not, with our in-house lawyer, Randall Miller.

[Fink's Attorney]: So if someone answered on the [Polygraph Disclosure Questionnaire], have you ever killed someone during or after sex, and they answered yes, and the next question is, describe what you did, you would contact state police?

[Mr. Welsh]: I have never had anyone answer that question. I have never run across that. That would definitely be a situation whereby if that did happen, I would definitely have to contact our team and our lawyer.

N.T. Probation Violation Hearing, 9/23/08, at 55–56.

¶ 13 Upon closing, the prosecutor summarized the import of Welch's testimony as follows:

MR. DYE: ... We had, in this courtroom, adamant testimony that nothing is asked of identities of the individuals, that the disclaimers are put on there primarily, as Mr. Welsh testified to, that they are told, don't disclose. If you disclose, if you give us names, if you give us specifics, then we are bound to disclose that to law enforcement. They are told adamantly, do not disclose identifying information.

*Id.* at 112. The trial court then determined accordingly that "[t]he responses that the polygraph required here did not compel [Fink] to give any information that could be used against him ... in a subsequent criminal trial. I mean, no one could figure out in the foggiest idea what was going on in those particular circumstances." *Id.* at 113. Thus concluding that Fink was not constitutionally absolved from answering the Polygraph Disclosure Questionnaire, the court found that his failure to answer and maintain satisfactory counseling status violated his parole and probation. Consequently, the court revoked probation and recommitted Fink to prison for the duration of his original sentence. Fink then filed this appeal, raising the question appearing in the opening paragraph of this decision, which challenges the court's interpretation of controlling precedent in *Shrawder* and related cases.[1]

---

1. For purposes of clarity, we repeat Fink's statement of the question:

Did the court err in finding that Mr. Fink violated his probation by being discharged from sex offender counseling for failing to completely disclose his sexual history, where disclosure of this history required Mr. Fink to confess to committing criminal acts, and provide information regarding these acts which could have provided an essential link in a chain of evidence resulting in criminal charges against him?

¶ 14 In *Shrawder*, we reviewed an issue of first impression for this Court, *i.e.*, the "propriety of therapeutic polygraphs in sex offender cases and the consequences for a probationer's refusal to submit to the same on Constitutional grounds." *Shrawder*, 940 A.2d at 440. The circumstances in *Shrawder* were substantially similar to those at bar inasmuch as the defendants in both cases were required to disclose potentially incriminating information about past criminal acts in response to questions posed pursuant to sex offender counseling.[2] In *Shrawder*, the appellant was required to complete sex offender counseling as a condition of his probation. *Id.* at 438. After learning that he would have to submit to a polygraph test as part of his counseling, the appellant filed a motion for declaratory judgment, arguing that compliance with the polygraph test violated his rights under the United States and Pennsylvania Constitutions. *Id.* A hearing was held on his motion, and the trial court subsequently found that the use of the therapeutic polygraph was a reasonable condition of probation. *Id.*

¶ 15 We premised our disposition in *Shrawder* upon pronouncements of both the United States Supreme Court and appellate court decisions from other states, which have recognized that although therapeutic examination is a desirable tool in sex offender counseling, the parameters of the examination must be properly circumscribed. *See Shrawder*, at 441–43. We distilled our conclusion as follows:

> [T]he therapeutic polygraph is an essential tool for a therapist whose job it is to reveal an offender's deception and en-

courage him or her to confront his or her urges and deviant behavior. The test results further the primary goal of counseling as part of a sexual offender's sentence, which is to rehabilitate the offender and prevent recidivism, with reasonably small incremental deprivations of the offender's liberty. We also note that ... the candor of [the appellant] or any other probationer is always expected during a probation inquiry, whether or not his responses are being recorded through a polygraph test. We therefore conclude that polygraph testing can, and in this case does, further sentencing goals without excessive deprivations of liberty and hold that a therapeutic polygraph is a proper element in a sex offender treatment program for a convicted sexual offender and does not violate a probationer's rights under the Fifth Amendment to the United States Constitution or under Article One, Section Nine of the Pennsylvania Constitution, *so long as the inquiries made pursuant to it relate to the underlying offense for which an offender has been sentenced and do not compel him or her to provide information that could be used against him or her in a subsequent criminal trial.*

*Id.* at 443 (emphasis added).

¶ 16 Our conclusion in *Shrawder* hinged in substantial part on the United States Supreme Court's decision in *Minnesota v. Murphy*, 465 U.S. 420, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984). In *Murphy*, the defendant commenced a sentence of probation on condition that he participate in a sexual offenders' treatment program and

---

Brief for Appellant at 4.

**2.** Although the questions at issue here were posed in written form in a questionnaire prepared in anticipation of a polygraph, we discern no material distinction between the presentation of such questions in writing or orally

by a polygraph examiner as, in either instance, the defendant's participation is legally compelled. Accordingly, the restrictions imposed in *Shrawder* upon actual polygraph examinations also apply to questions posed in writing. *See id.* at 443.

report to his probation officer, being truthful with that officer "in all matters." *Id.* Although the defendant was directed that if he failed to comply with these terms his probation could be revoked, he was not informed that disclosure of past crimes could result in criminal prosecution. Subsequently, during the course of one of his meetings with his probation officer, the defendant admitted that he had committed a rape and murder. *Id.* at 420, 104 S.Ct. 1136. The state then indicted him for those crimes, prompting the defendant to seek suppression of the confession to his probation officer on the grounds that it was obtained in violation of his Fifth and Fourteenth Amendment rights. *Id.*

■ ¶ 17 Significantly, the Supreme Court made clear in *Murphy* that a state may not constitutionally carry out a threat to revoke probation for the legitimate exercise of the Fifth Amendment privilege. Thus, the Court analyzed the extent to which a probationer's status alters the conditions under which his exercise of the privilege may be legitimate. The Supreme Court explained that,

> [a] state may require a probationer to appear and discuss matters that affect his probationary status; such a requirement, without more, does not give rise to a self-executing privilege. The result may be different if the questions put to the probationer, however relevant to his probationary status, call for answers that would incriminate him in a pending or later criminal prosecution.

*Id.* at 435, 104 S.Ct. 1136.

¶ 18 Thus, the Court inquired "whether [the defendant's] probation conditions merely required him to appear and give testimony about matters relevant to his probationary status or whether they went farther and required him to choose between making incriminating statements and jeopardizing his conditional liberty by

remaining silent." *Id.* at 436, 104 S.Ct. 1136. The Court explained that, "[o]n its face, [the defendant's] probation condition proscribed only false statements; it said nothing about his freedom to decline to answer particular questions and certainly contained no suggestion that his probation was conditional on his waiving his Fifth Amendment privilege with respect to further criminal prosecution." *Id.* at 437, 104 S.Ct. 1136. The Court reasoned accordingly that as the appellant was only "informed that he was required to be truthful with his probation officer in all matters and that failure to do so could result in revocation of probation," it was "hesitant to read into the truthfulness requirement an additional obligation that [the appellant] refrain from raising legitimate objections to furnishing information that might lead to his conviction for another crime." *Id.* at 436, 437, 104 S.Ct. 1136.

¶ 19 In the absence of an express warning to the probationer that he need not disclose information concerning crimes other than the one for which he was then serving probation, the Court concluded that his answers were privileged under the Fifth Amendment and could provide no basis either for a new prosecution or revocation of his current probation. *See id.* at 438, 104 S.Ct. 1136 ("Our decisions have made clear that the state could not constitutionally carry out a threat to revoke probation for the legitimate exercise of the Fifth Amendment privilege."); 435–36, 104 S.Ct. 1136 ("[A] state may validly insist on answers to even incriminating questions and hence sensibly administer its probation system, as long as it recognizes that the required answers may not be used in a criminal proceeding and thus eliminates the threat of incrimination."); 441–42, 104 S.Ct. 1136 (Marshall, J., joined by Stevens and Brennan, JJ., dissenting) ("[I]f there is a chance that a truthful answer to a

given question would expose the probationer to liability for a crime different from the crime for which he has already been convicted, he has a right to refuse to answer and the state may not attempt to coerce him to forgo that right. As the majority points out, if the answer to a question might lead both to criminal sanctions and to probation revocation, the state has the option of insisting that the probationer respond, in return for an express guarantee of immunity from criminal liability.").

■ ¶ 20 Our holding *Shrawder* incorporates the Court's reasoning in *Murphy* and, by so doing, effectively limits the information that may be sought in therapeutic polygraphs or questionnaires. Assuming that the questions posed "relate to the underlying offense for which an offender has been sentenced[,]" *Shrawder*, 940 A.2d at 443, they must also refrain from seeking information "that could be used against [the offender] in a subsequent criminal trial[,]" *id.* Should the Commonwealth[3] choose to elicit such information nonetheless, it may do so only upon express recognition of the privilege against self-incrimination; an offender who refuses to answer questions bearing on criminal conduct other than that underlying his probation or parole must do so assured of the constitutional imperative that his answers will not subject him to prosecution or render him in violation of the conditions of his current sentence. *See Murphy*, 465 U.S. at 435–36, 104 S.Ct. 1136; *But see Commonwealth v. Swinehart*, 541 Pa. 500, 664 A.2d 957, 964 (1995) (quoting *Kastigar v. United States*, 406 U.S. 441, 453, 92 S.Ct. 1653, 32 L.Ed.2d 212 (1972) ("We

hold that such immunity from use and derivative use is coextensive with the scope of the privilege against self-incrimination and therefore is sufficient to compel testimony over a claim of the privilege.")).

■ ¶ 21 In this regard, assurances of confidentiality as were offered here by witnesses who administer sex offender counseling on the Commonwealth's behalf, although no doubt well-intended, are constitutionally inadequate. Our Courts have long recognized that "if an individual possesses *reasonable* cause to apprehend danger of prosecution, 'it is not necessary that a *real* danger of prosecution exist to justify the exercise of the privilege against self incrimination.'" *Commonwealth v. Saranchak*, 581 Pa. 490, 866 A.2d 292, 303 (2005) (quoting *Commonwealth v. Carrera*, 424 Pa. 551, 227 A.2d 627, 629 (1967) (emphasis added)). "Moreover, the privilege extends not only to the disclosure of facts which would in themselves establish guilt, but also to any fact which might constitute an essential link in a chain of evidence by which guilt can be established." *Id.* (quoting *Carrera*, 227 A.2d at 629). Should an offender assert the privilege against self-incrimination in response to questions an honest answer to which would reveal such information, his claim may be overruled only upon a determination by the court that in view of the totality of the circumstances, it is "perfectly clear" that "the witness is mistaken in the apprehension of self-incrimination and the answer demanded cannot possibly have such a tendency." *Id.* (quoting *Carrera*, 227 A.2d at 629).

**3.** To the extent that a probationer is compelled to participate in counseling as a condition of probation, any mental health provider in whose program he enrolls is subject to the same limitations as the Commonwealth itself. We are cognizant as well that answers provided by probationers or parolees in response to questions posed in counseling may be subject to a statutory privilege against disclosure binding upon metal health providers. *See* 42 Pa.C.S. § 5944. However, the extent of that privilege is not before us in this appeal; accordingly, we leave its application for another occasion.

¶ 22 In this case, the trial judge reached an approximation of the foregoing standard in concluding that the information sought by the questions in the Polygraph Disclosure Questionnaire would not offer an investigator "the foggiest idea what was going on in those particular circumstances." N.T. Probation Violation Hearing, 9/23/08, at 113. Nevertheless, upon careful consideration of the Questionnaire, we find the court's conclusion unsustainable. As our Supreme Court admonished in *Saranchak*, the information at issue need not be such as "would in [itself] establish guilt," but only such as "might constitute an essential link in a chain of evidence by which guilt can be established." *Id.* (quoting *Carrera*, 227 A.2d at 629). Adjudged by this standard, the information sought by the Questionnaire is more than ample to forge such a link and must implicate the privilege against self-incrimination. Regardless of the assertion so often repeated at Fink's probation violation hearing, that offenders were told not to disclose personally identifiable information, the Questionnaire refrains only from asking the names of the victims of putative offenses the Commonwealth might readily investigate—and prosecute. Indeed, the offender's compelled recitation of, among other things, the ages of his past victims, his relationship to them, the dates and durations of his assaults, the specific conduct in which he engaged during assaults, the specific injuries he inflicted, and the specific means he used, *i.e.*, "the ropes, chains, handcuffs, tape or other restraints[,]" offers a wealth of information to any investigator sufficiently ambitious to pursue it. In the absence of express recognition by the Commonwealth that such revelations are constitutionally privileged, they remain, either singly or in combination with one another, readily identifiable "link[s] in a chain of evidence by which guilt can be established." *See Saranchak*, 866 A.2d at 303. We need not recite the myriad similar links by which circumstantial evidence has proven countless cases now committed to the many shelves of this Court's reports. Indeed, we can scarcely conceive of a scenario in which evidence of similar facts has not undergirded the Commonwealth's case. Although the mental health providers who tender services to offenders like Fink may, as testified by John Welsh, earnestly desire not to disclose incriminating information, the limitations of intention speak for themselves. N.T. Probation Violation Hearing, 9/23/08, at 56 ("[Mr. Welsh]: I have never had anyone answer that question. I have never run across that. That would definitely be a situation whereby if that did happen, I would definitely have to contact our team and our lawyer."). In view of the Commonwealth's failure to afford Fink his privilege against self-incrimination, we find Fink's responses privileged. We conclude in addition that the trial court erred in treating Fink's refusal to answer the Polygraph Disclosure Questionnaire as grounds for revocation of his parole/probation.

¶ 23 For the foregoing reasons, we vacate the judgment of sentence and remand for reinstatement of the defendant's parole and probation. Any renewed sex offender counseling in which the defendant participates shall be conducted in accordance with the constitutional safeguards against self-incrimination set forth in this Opinion.

¶ 24 Judgment of sentence **VACATED.** Case **REMANDED** for reinstatement of parole and probation. Jurisdiction **RELINQUISHED.**