**In the Interest of C.O.**

**Appeal of Commonwealth of Pennsylvania, Appellant.**

Superior Court of Pennsylvania.

Argued Sept. 18, 2013.
Filed Jan. 3, 2014.
Reargument Denied March 5, 2014.

Morton's favor by shifting the jury's attention and inflaming its passions against PCC.

Michael T. Rakaczewski, Assistant District Attorney, Stroudsburg, for Commonwealth, appellant (submitted).

Lourdes M. Rosado, Philadelphia, for appellee.

BEFORE: BENDER, P.J., DONOHUE and MUSMANNO, JJ.

OPINION BY MUSMANNO, J.:

The Commonwealth of Pennsylvania appeals from the juvenile court's Order suppressing the statements made by C.O. We affirm.

The juvenile court has set forth the relevant underlying factual history as follows, in pertinent part:

On February 3, 2011, in three separate cases, [C.O.] made voluntary, counseled admissions to committing felony sex offenses, including sexual abuse of children, indecent assault, and multiple counts of involuntary deviate sexual intercourse, against three ... children. Based on the admissions, plus information concerning [C.O.] that was provided during the hearing at which the admissions were accepted, [the juvenile court] adjudicated [C.O.] delinquent and immediately imposed disposition. [C.O.] was placed in the temporary legal custody of Monroe County Children and Youth Services ("MCCYS"), under the supervision of the Monroe County Juvenile Probation Office ("JPO"), for placement at La–Sa–Quik.

La–Sa–Quik is a residential treatment facility for adolescent male sex offenders between the ages of twelve and one-half and eighteen. It is licensed as a community based program. The facility is neither staffed nor supervised by psychiatrists or licensed psychologists. Rather, staff and treatment team members hold a variety of bachelor and associate degrees. There are some licensed social workers. All therapists and counselors receive industry standard training, are required to obtain sex offender treatment certification, and are mandated reporters. [Staff members of La–Sa–Quik are mandated child abuse reporters who must report to Child Line any abuse disclosed by juveniles who are placed at the facility.]

\* \* \*

La–Sa–Quik is not a secure juvenile facility. However, since juveniles are court ordered to the program they are not free to leave the facility. Juveniles are supervised twenty-four hours a day, seven days per week. . . . .

When juveniles are placed at La–Sa–Quik, they are required to sign and acknowledge notices of the facility's confidentiality and privacy practices, including the Confidentiality Standards for [the parent company of La–Sa–Quick,] Adelphoi Village ("Confidentiality Standards"). The Confidentiality Standards explain the limits of confidentiality pertaining to disclosures as follows: "However, I understand that if I discuss or disclose crimes that I have committed, or situations that involve

physical, sexual, or emotional abuse that are unreported, the Adelphoi Village staff are mandated to inform the appropriate authorities." The Confidentiality Standards form does not specify that disclosures will be shared with law enforcement or the district attorney's office, nor does it state that disclosures may be used as incriminating evidence in criminal or juvenile proceedings. [C.O.] signed a Confidentiality Standards form on October 10, 2011.

\* \* \*

Consistent with their training and with general sex offender treatment standards, counselors at La–Sa–Quik teach that honesty and full disclosure of victims and offending history is the best policy. According to both [Christopher Moser ("Moser"), the clinical supervisor at La–Sa–Quik, and Karen Choate–Bassett ("Bassett"), a therapist at La–Sa–Quik], disclosure of previously undisclosed victims is essential to treatment because it helps hold [juveniles] accountable and it also helps [the authorities] get the victim the help they need. Juveniles are also counseled to participate in treatment so that when they graduate[,] the juveniles won't have any skeletons in their closet that may come back later to haunt them [by] another victim coming forward and leaving a black mark on the treatment they received or resulting in additional charges. The juveniles need to ... get everything in order while they're with La–Sa–Quik to avoid any future repercussions to the victim or to them.

[C.O.] entered La–Sa–Quik on March 1, 2011. He had a difficult time adjusting to the La–Sa–Quik program and sex offender treatment modalities.... [ ] Moser stated that ... [C.O.] did not complete the clinical assignments assigned by his counselor and was having difficulty engaging in group sessions and sharing information in individual sessions. Similarly, the court report prepared for [C.O.'s] first placement and dispositional review hearing indicated that [C.O.'s] performance in individual counseling was unsatisfactory, that he wasn't [communicating] openly with his counselors, that he recently expressed that he no longer had a problem, that his largest stumbling block was his belief he no longer needed treatment to address his offending, and that, in general, he was not progressing. Accordingly, the report indicated that treatment would focus on getting [C.O.] to take ownership. On July 28, 2011, a placement review hearing was held. At that time, as the referenced court report indicated, [C.O.] ... was floundering. In an effort to inform, guide, motivate, challenge, and be honest with [C.O.], the [juvenile court] spoke openly to [C.O.]. Among other things, concern was expressed over [C.O.'s] lack of progress. The balanced and restorative justice concepts of accountability, community protection, and competency development were explained, generally and in the context of [C.O.'s] particular case and situation. In addition, [C.O.] was told that, in order to be released, he needed to invest in his treatment, pick up his game, make progress, complete the program, and demonstrate that he is no longer a danger to others. The [juvenile court] extracted a promise from [C.O.] to listen, be compliant, and work hard at treatment.

\* \* \*

On November 9, 2011, during a scheduled individual counseling session, [C.O.] disclosed to [ ] Bassett that he had sexually abused a fourth child victim. [ ] Bassett told [C.O.] that she was a man-

dated reporter and that she would have to report the abuse and the victim to Child Line. She asked [C.O.] who the victim was, where the offense happened, how often sexual contact occurred, and how he gained the victim's trust. She then asked [C.O.] to fill out and sign a Sexual Offender Disclosure Form describing the offense. [C.O.] complied.

When [ ] Bassett instructed [C.O.] to fill out the form, she did not, formally or informally, advise him of his legal rights or options. She did not tell him that he could decline to complete the form or that he could end the session. She did not advise him that he could face new charges, that what he said could be used against him in court, or that he had a right to speak with an attorney. Similarly, [C.O.] was not given the opportunity to call his father or his attorney.

[ ] Bassett processed the disclosures in accordance with legal reporting requirements and La–Sa–Quik protocols. After the disclosures were made, [ ] Bassett contacted [C.O.'s] family, [C.O.'s] probation officer, and [ ] Moser. She also called Child Line to report the disclosure and the [fourth child] victim. . . .

Child Line turned the disclosure over to MCCYS, the agency in whose temporary legal custody [the juvenile court] placed [C.O.] for purposes of placing him at La–Sa–Quik. [Carolyn Reviello ("Reviello") ], a supervisor at the agency, received [C.O.'s] case and conducted the investigation. Upon receiving the referral, [ ] Reviello prepared and sent a CY 104 form to the Monroe County District Attorney and the Stroud Area Regional Police Department. The form included a summary of the disclosures made to [ ] Bassett. [ ] Reviello located the [fourth child] victim and interviewed him on No-

vember 14, 2011. She then contacted La–Sa–Quik [to] set up a phone interview with [C.O.]

On December 2, 2011, [ ] Reviello interviewed [C.O.] by phone. No law enforcement officers were involved in the interview. [C.O.'s] previous individual counselor was the only person in the room with [C.O.] during the call. [ ] Reviello explained that she was calling because she had received an allegation that he [had] sexually abused another child. [C.O.] indicated that he was aware of the investigation because he had received the letter [ ] Reviello had sent informing him of the allegation. [C.O.] also indicated that he was familiar with MCCYS because he had gone through the same process before. [ ] Reviello told [C.O.] that he had the opportunity to comment on the allegations if he wished, or not. [C.O.] then made incriminating statements about his sexual contact with the [fourth child] victim. Prior to the incriminating statements being made, [ ] Reviello did not advise [C.O.] of his rights, did not ask [C.O.] if he wanted to speak with his . . . attorney, and did not tell him that his statements could be used against him in court.

Juvenile Court Opinion, 7/11/12, at 2–11 (citations, footnotes, and some brackets and quotation marks omitted).

On January 12, 2012, the Commonwealth filed a delinquency Petition alleging that C.O. had committed rape of a child, involuntary deviate sexual intercourse with a child, and indecent assault against a seven-year-old boy. Prior to the adjudication hearing, C.O. filed a Motion to suppress his statements to Bassett and Reviello. Following a hearing, the juvenile court granted C.O.'s suppression Motion.

■■■ The Commonwealth appealed,[1] raising the following question for our review: "Did the [juvenile] court err in suppressing incriminating statements by [C.O.] to youth counselors at La–Sa–Quick and [MCCYS] caseworkers while he was in the custody of La–Sa–Quick?" Brief for the Commonwealth at 4.

When reviewing the propriety of a suppression order, an appellate court is required to determine whether the record supports the suppression court's factual findings and whether the inferences and legal conclusions drawn by the suppression court from those findings are appropriate. Where the defendant prevailed in the suppression court, we may consider only the evidence of the defense and so much of the evidence for the Commonwealth as remains uncontradicted when read in the context of the record as a whole. Where the record supports the factual findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error. However, where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's conclusions of law are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts.

*In re O.J.*, 958 A.2d 561, 564 (Pa.Super.2008) (*en banc*) (brackets, quotation marks, and citations omitted).

■■■ The Commonwealth contends that the juvenile court erred in suppressing C.O.'s statements made to Bassett. Brief for the Commonwealth at 10. The Commonwealth argues that *Miranda*[2] warnings were not required in this case because the La–Sa–Quick employees were not law enforcement officials and were not acting as agents of the Commonwealth. *Id.* at 10, 16–17. The Commonwealth also argues that C.O.'s statements were voluntary because (1) there were no police officers present and the only people present were C.O., the counselor and an intern; (2) C.O. never asked Bassett to stop questioning him; (3) the interview lasted a short period of time; (4) C.O. was not under duress when making the statements; (5) C.O. was not handcuffed while making the statements; (6) C.O. was seventeen years old at the time he made the statements and was aware of the disclosure process in treatment programs like La–Sa–Quick; and (7) Bassett never promised C.O. that he would not be charged if he confessed to any crimes. *Id.* at 12–14, 18–20. The Commonwealth further points out that C.O. had signed a "Confidentiality Standards" form, which limits the confidentiality of any conversation where the juvenile patient discloses information regarding abuse, and mandates that the staff inform the appropriate authorities. *Id.* at 14–16, 17, 20.

To safeguard an uncounseled individual's Fifth Amendment privilege against self-incrimination, suspects subject to custodial interrogation by law enforcement officers must be warned that they have the right to remain silent, that anything they say may be used against them in court, and that they are entitled to the presence of an attorney. *See Thompson v. Keohane*, 516 U.S. 99, 107, 116 S.Ct. 457, 133 L.Ed.2d 383 (1995)

---

1. It is well-settled that the Commonwealth "may take an appeal as of right from an order that does not end the entire case where the Commonwealth certifies in the notice of appeal that the order will terminate or substan-

tially handicap the prosecution." Pa.R.A.P. 311(d).

2. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

(citing [*Miranda,* 384 U.S. at 444, 86 S.Ct. 1602] ). Juveniles, as well as adults, are entitled to be apprised of their constitutional rights pursuant to *Miranda. See In re Gault,* 387 U.S. 1, 57, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). If a person is not advised of his *Miranda* rights prior to custodial interrogation by law enforcement officers, evidence resulting from such interrogation cannot be used against him. *See Miranda,* 384 U.S. at 436, 444, 478–79, 86 S.Ct. 1602; *Commonwealth v. Chacko,* 500 Pa. 571, 459 A.2d 311, 314–15 (1983). A person is deemed to be in custody for *Miranda* purposes when "[he] is physically denied of his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action or movement is restricted by the interrogation." *Commonwealth v. Williams,* 539 Pa. 61, 650 A.2d 420, 427 (1994) (citations omitted).

*In re R.H.,* 568 Pa. 1, 791 A.2d 331, 333 (2002); *see also Commonwealth v. Snavely,* 982 A.2d 1244, 1247 (Pa.Super.2009) (stating that the central inquiry regarding the applicability of a Fifth Amendment privilege is whether the threat of future criminal prosecution is reasonably particular and apparent). "In order to trigger the safeguards of *Miranda,* there must be both custody and interrogation." *Commonwealth v. Heggins,* 809 A.2d 908, 914 (Pa.Super.2002). "Interrogation is defined as police conduct calculated to, expected to, or likely to evoke [an] admission." *Id.* (citation and quotation marks omitted). Moreover, "[u]nder certain circumstances, individuals who are not law enforcement personnel nevertheless possess the status of law enforcement for purposes of custodial interrogation." *Id.; see also Commonwealth v. McGrath,* 504 Pa. 103, 470 A.2d 487, 493 (1983) (stating that a "determination of whether statements were elic-ited at a custodial interrogation must be made in light of the totality of the circumstances involved, and the status of the questioner is only one of the relevant circumstances.") (citation omitted).

Here, the Commonwealth concedes that C.O. was in custody at La–Sa–Quick. Brief for the Commonwealth at 10. However, the Commonwealth argues that *Miranda* warnings were not necessary based upon the reasoning in *Heggins.* In *Heggins,* the juvenile court assigned the defendant to a treatment facility, following a determination that defendant was delinquent. *Heggins,* 809 A.2d at 910. The purpose of the facility was to counsel juvenile delinquents about the general criminal lifestyle they had engaged in and their thought processes regarding crime in general. *Id.* Upon arriving at the treatment facility, the juveniles were informed that any specific information they provided regarding an unsolved crime would be reported to law enforcement. *Id.* While at the treatment facility, the defendant made several inculpatory statements regarding his involvement in a murder. *Id.* These statements were reported to the authorities, and the defendant was arrested and subsequently convicted of murder of the second degree. *Id.* The defendant appealed, claiming, *inter alia,* that his statements during treatment should not have been introduced at trial because, at the time he made the statements, he was subject to custodial interrogation and was not provided with *Miranda* warnings. *Id.* at 913. This Court determined that the defendant, who was in custody, was not subject to an interrogation at the time he made the statements, and did not require the issuance of *Miranda* warnings. *Id.* at 915–16. This Court specifically concluded that the counselors at the treatment facility were not the equivalent of law enforcement for *Miranda* purposes because they were not

investigating crimes and reporting their findings to the authorities; the counselors merely required the defendant to discuss his criminal lifestyle in general terms and did not require him to admit to other crimes; and the defendant was aware that any specific information regarding unsolved crimes would be reported to law enforcement. *Id.*

We conclude that the *Heggins* reasoning is distinguishable from the facts of this case. The juvenile court summarized the relevant facts underlying C.O.'s statements as follows:

> When [C.O.] made the incriminating statements, he was a seventeen year-old boy who had previously been adjudicated delinquent of serious sexual offenses against young children and, in addition to having sex offender issues, was identified as having mental health issues. As a result, [C.O.] had been placed out-of-home in La–Sa–Quik, a long-term sex offender-specific residential treatment facility....
>
> While at La–Sa–Quik, [C.O.] was constantly told that treatment and successful completion of the program required full disclosure of all victims and offending behaviors, known and unknown. For eight months, [C.O.] did not make progress. Both [C.O.] and [the juvenile court] had been informed that the lack of progress was due to [C.O.'s] failure to openly [communicate] with counselors, take ownership of his crimes and victims, and make full disclosures.
>
> The treatment team at La–Sa–Quik pushed [C.O.] to disclose. Th[e juvenile c]ourt understands that the facility did so for proper therapeutic and societal reasons. Nevertheless, it is clear that [C.O.] was pressed to disclose. Taking into consideration the totality of the circumstances and players, it was not just La–Sa–Quik counselors who pushed [C.O.] towards disclosure. Th[e juvenile c]ourt got into the act when, at his first placement review hearing, [C.O.] was admonished to invest in his treatment, "pick up his game," and do what his counselors asked of him in order to make progress, graduate from the program, and demonstrate that he was no longer a danger to children or the community. The [juvenile court] was empowered, instructed, and properly motivated by the Juvenile Act, the rehabilitative needs of the juvenile, the needs of the victims, and the needs of society to push for treatment and competencies, but doing so was nonetheless another source of pressure to disclose. Against this backdrop of stagnation and pressure to perform, [C.O.] walked into [ ] Bassett's office and made the disclosure that led to the civil and criminal investigations, the interview with [ ] Reviello, and the filing of this case. The disclosure also led to discussions at numerous counseling sessions that were intended to be used by La–Sa–Quik as part of the treatment and therapeutic processes, but are now intended by the Commonwealth to be used as evidence. [C.O.] made his first disclosure to a therapist whom he believed was there to help him. [Although C.O.] signed the Confidentiality Standards[,] which contained a one-line statement that any new offenses would be reported to authorities, he did so a month prior to the disclosures. The warning was not repeated until after he had disclosed as he had been urged to do.

Juvenile Court Opinion, 7/11/12, at 16–18 (footnote omitted).

██ Here, unlike *Heggins*, in order to successfully complete the treatment program, C.O. was required to answer questions not only about the offenses that resulted in the commitment, but also about

any other undisclosed and uncharged sexual misconduct. *Cf. Heggins*, 809 A.2d at 915–16 (stating that *Miranda* warnings were not required because, *inter alia*, the counselors required the defendant to discuss his criminal lifestyle in general terms and did not require him to admit to other crimes). Further, pursuant to mandatory reporting requirements, the counselors in this case were compelled to provide any information regarding previously undisclosed sexual misconduct to law enforcement officers. N.T., 1/23/12, at 17–18, 43–46. Moreover, the trial court directed C.O. to answer all of the counselors' questions, including those pertaining to uncharged sexual conduct, in order to gain release from the program. *See In re K.Q.M.*, 873 A.2d 752, 756–57 (Pa.Super.2005) (concluding that where the totality of the circumstances demonstrated that the juvenile believed his freedom of action was restricted and that he had no choice but to cooperate with the investigation, the juvenile was subject to a custodial interrogation and had to be advised of his *Miranda* rights); *see also Minnesota v. Murphy*, 465 U.S. 420, 435–36, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984) (stating that where the State, either expressly or by implication, asserts that invocation of the privilege against self-incrimination would lead to a revocation of probation, the probationer is subject to a classic penalty situation and is deprived of his privilege against self-incrimination; thus, the probationer's statements are deemed compelled and are inadmissible). Thus, it is clear that requiring C.O. to speak about crimes for which he has never been adjudicated, and which resulted in incriminating responses, is express questioning and constituted interrogation. Additionally, the fact that C.O. signed a "Confidentiality Standards" form, thereby waiving his right to confidentiality of any statements made to La–Sa–Quik staff, does not forestall the need for *Miranda* warnings. *See Commonwealth v. Fink*, 990 A.2d 751, 760–61 (Pa.Super.2010) (concluding that when a parolee, as part of sex offender counseling, had to sign a contract acknowledging that any disclosures would be provided to the police, he did not waive the his Fifth Amendment privileges where he refused to complete a questionnaire requesting information on past conduct that was not the subject of the criminal prosecution).

■ Based upon these facts, Bassett, while not a police officer, was required to provide *Miranda* warnings to C.O., as the disclosure of information regarding the sexual abuse of the fourth child victim formed the basis for prosecution on these acts. *See Estelle v. Smith*, 451 U.S. 454, 469, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) (holding that a psychiatrist, who performed an involuntary evaluation of the defendant, could not testify regarding information that had been gathered by questioning during the evaluation, because the defendant had not been apprised of his Fifth Amendment rights); *Heggins*, 809 A.2d at 914–15 (collecting cases where persons who were not law enforcement conducted a custodial interrogation requiring the application of *Miranda*); *see also Commonwealth v. Shrawder*, 940 A.2d 436, 443 (Pa.Super.2007) (concluding that a therapeutic polygraph is a proper element in a sex offender treatment program for a convicted sexual offender and does not violate a probationer's rights under the Fifth Amendment "so long as the inquiries made pursuant to it relate to the underlying offense for which an offender has been sentenced and do not compel him or her to provide information that could be used against him or her in a subsequent criminal trial."). Accordingly, the juvenile court properly suppressed C.O.'s state-

ments to Bassett.[3]

 The Commonwealth additionally contends that the juvenile court erred in suppressing C.O.'s statements to Reviello based upon the failure to provide *Miranda* warnings to C.O. Brief for the Commonwealth at 20. While the Commonwealth concedes that C.O. was in custody at the time of his statements to Reviello, the Commonwealth argues that *Miranda* warnings were not needed in this case as Reviello was not investigating the case for which C.O. was in placement, but instead was investigating an allegation of abuse from another case. *Id.* at 21, 23. The Commonwealth asserts that since no charges had been filed in the other case, no right to counsel attached. *Id.* at 23–24. The Commonwealth claims that C.O. knew Reviello and knew why she was contacting him, and that he voluntarily spoke to her. *Id.* at 24.

The juvenile court has addressed the Commonwealth's arguments and concluded that the statements to Reviello must be suppressed because they were elicited during a custodial interrogation and *Miranda* warnings were not provided:

> Civil investigators may conduct custodial interrogation requiring *Miranda* warnings. [*Commonwealth v. Ramos,* 367 Pa.Super. 84, 532 A.2d 465, 468 (1987).] In *Ramos,* a children and youth agency

caseworker interviewed the defendant while he was being held on child molestation charges at a county jail. The caseworker informed the defendant that the investigation was civil, not criminal, in nature. The defendant subsequently confessed to the molestation, which the caseworker reported to the police. The Superior Court held that suppression of the confession was proper, because the confession was elicited during [a] custodial interrogation without *Miranda* warnings having been given. The [C]ourt reasoned that children and youth services is not only a treatment facility, but is also the investigating arm of the statewide system of Child Protective Services.

> In this case, as in *Ramos,* [ ] Reviello was a children and youth agency caseworker. After reporting the disclosure to the police and district attorney, she interviewed [C.O.] for the express purpose of investigating whether [C.O.] sexually abused the [fourth child] victim. . . . [S]ince *Miranda* warnings were not given, suppression of the statements made by [C.O.] is, under the facts and circumstances of this case and the holding and rationale of *Ramos,* proper and necessary.

The Commonwealth attempts to distinguish *Ramos* from this case on the basis

---

**3.** We note that we can affirm the juvenile court's decision on any basis. *Commonwealth v. Lee,* 947 A.2d 199, 202 n. 3 (Pa.Super.2008). Here, with regard to the statements made to Bassett, the juvenile court did not rule on the need for *Miranda* warnings, but instead found that C.O. had not voluntarily provided the statements. *See* Juvenile Court Opinion, 7/11/12, at 12–26. The juvenile court, in part, relied upon an unpublished memorandum of this Court, which stated that *Miranda* warnings were not required in a case with facts similar to the case at bar. *See id.* at 13–14. It is well-settled that "[a]n unpublished memorandum decision shall not

be relied upon or cited by a Court or a party in any other action or proceeding[.]" *Commonwealth v. Greer,* 866 A.2d 433, 436 n. 3 (Pa.Super.2005). "[S]uch a memorandum decision may be relied upon or cited (1) when it is relevant under the doctrine of law of the case, res judicata, or collateral estoppel, and (2) when the memorandum is relevant to a criminal action or proceeding because it recites issues raised and reasons for a decision affecting the same defendant in a prior action or proceeding." *Id.* As these requirements were not present in the instant case, we need not rely upon the unpublished decision cited in the juvenile court's Opinion.

that the defendant in *Ramos* had been charged and had invoked his right to counsel before he was interviewed by the caseworker, while [C.O.] had not yet been charged and had not asked for an attorney before [ ] Reviello spoke with him. In addition, the Commonwealth points out that other cases have[,] in some instances[,] held that questioning by children and youth caseworkers did not require *Miranda* warnings. The distinctions that the Commonwealth attempts to draw and the other cases it summarily cites are unavailing.

The holding in *Ramos* is based not on the timing of the filing of the criminal charges, but rather, on the fact that, while acting as the "investigative arm of the statewide system of Child Protective Services" and investigating a report of child abuse that also resulted in the filing of criminal charges, a children and youth caseworker elicited incriminating statements from a suspect who was in custody. That is exactly the fact pattern here. Additionally, the fact that the defendant in *Ramos* had invoked his right to counsel was an *additional* basis for suppression of the statements, over and above the finding that *Miranda* warnings were required but not given. In any event, the defendant in *Ramos* had been advised of his right to an attorney, while [C.O.] had not. Finally, the cases cited by the Commonwealth as examples of situations where statements obtained by children and youth agency caseworkers were not suppressed are inapposite. Those cases involved situations where the defendant seeking suppression was either not in custody or had voluntarily met with the caseworker.

Juvenile Court Opinion, 7/11/12, at 24–25 (emphasis in original).

We agree with the sound reasoning of the juvenile court and conclude that C.O. was in custody and subject to interrogation by Reviello. *See id.* While Reviello was not a police officer, she was required to provide *Miranda* warnings to C.O. because she, as a MCCYS caseworker, was investigating C.O. and her questions elicited incriminating responses from C.O. that formed the basis for the prosecution in the instant case. *See Ramos,* 532 A.2d at 468; *see also Estelle,* 451 U.S. at 469, 101 S.Ct. 1866. Based upon the foregoing, the juvenile court properly suppressed C.O.'s statements to Reviello.

Order affirmed.